J-S27011-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: K.B.T. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: E.T., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1149 WDA 2018 |

Appeal from the Decree Entered July 17, 2018
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
No. 42 of 2018

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: B.K.T., JR. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: E.T., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1667 WDA 2018 |

Appeal from the Decree Entered October 19, 2018
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
84 In Adoption 2018

BEFORE:   OLSON, J., OTT, J., and COLINS*, J.

MEMORANDUM BY OLSON, J.:                    **FILED JUNE 27, 2019**

Appellant, E.T. ("Mother"), files these consolidated appeals from the decree dated July 16, 2018, and entered July 17, 2018, and the decree dated October 18, 2018, and entered October 19, 2018,[1] in the Erie County Court of

---

[1] The subject decrees were dated July 16, 2018 and October 18, 2018. However, notice pursuant to Pa.R.C.P. 236(b) was not provided until July 17,

---

*   Retired Senior Judge assigned to the Superior Court.

Common Pleas, granting the petitions of the Erie County Office of Children and Youth ("OCY" or "the Agency") and involuntarily terminating her parental rights to her minor, dependent sons, K.B.T., born in March 2017, and B.K.T., Jr., born in January 2018 (collectively, the "Children"). As to K.B.T., Mother's parental rights were terminated pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). As to B.K.T., Jr., Mother's parental rights were terminated pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (b).[2] In addition, on March 22, 2019, counsel for Mother ("Counsel") filed petitions to withdraw and an **Anders**[3] brief, averring that the within appeal is frivolous. After review, we grant Counsel's motions to withdraw, and affirm the trial court's decrees.

Mother filed separate appeals as to each child and the trial court filed separate opinions. This Court consolidated Mother's appeals *sua sponte* and we, therefore, address Mother's appeals together. First, we address K.B.T.

_____

2018 and October 19, 2018. Our appellate rules designate the date of entry of an order as "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b)." Pa.R.A.P. 108(b). Further, our Supreme Court has held that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given." **Frazier v. City of Philadelphia**, 557 Pa. 618, 621, 735 A.2d 113, 115 (1999).

[2] By separate decree dated July 16, 2018, and entered July 17, 2018, the trial court involuntarily terminated the parental rights of the unknown biological father of K.B.T. Further, by separate decree dated October 10, 2018, and entered October 19, 2018, the parental rights of K.C. ("Father"), the biological father of B.K.T., Jr., were voluntarily relinquished. Neither K.C. nor any known biological father has filed an appeal or is a party to the instant appeals.

[3] **Anders v. California**, 386 U.S. 738 (1967).

The trial court summarized the procedural and factual history relevant to K.B.T., in part, as follows:

### PROCEDURAL HISTORY AND FACTS

K.B.T. was born [in March 2017], son of [Mother] and an unknown biological father. K.B.T. was the subject of an [e]mergency [p]rotective [o]rder dated March 24, 2017. At a Shelter Care Hearing on March 27, 2017, sufficient evidence was presented that return of the child to the home of [Mother] was not in the best interest of the child. At the time of the hearing, an individual named K.C. was added as the putative father.

K.B.T. was adjudicated a dependent child on April 10, 2017, following a hearing on April 6, 2017. The mother stipulated to the adjudication and continued placement of her son. The grounds for the adjudication were:

a) [Mother] had significant cognitive limitation which affected her ability to safely parent the child. Further, the mother reported she was unable to remember her daily activities.

b) [Mother] reportedly suffered from several mental health diagnoses including schizophrenia, bipolar disorder, anxiety and depression. The mother was not actively seeking mental health treatment, but has since engaged in mental health treatment and medication management.

c) [Mother] has a history of unstable housing and homelessness.

d) [Mother] was residing with multiple individuals who had lengthy histories with OCY, including one who was an indicated perpetrator of abuse.

The [j]uvenile [c]ourt [h]earing [o]fficer proceeded to a [d]ispositional [h]earing following the April 6, 2017 [a]djudication [h]earing. The following treatment plan was ordered by the [c]ourt:

1. Complete the Erie Homes for Children and Adults parent skills education program and demonstrate the ability to provide for the health, safety and welfare of the child;

2. Obtain safe and stable housing;

3. Obtain employment or provide verification of alternative income;

4. Participate in a mental health assessment and follow all recommendations to include counselling, [and] medication management, and demonstrate mental health stability and the ability to maintain the child's safety through exercise of good judgement;

5. Participate in an agency approved anger management program; and,

6. Inform the [A]gency of the identity of all household members.

The [c]ourt ordered the child's permanent placement goal to be return to parent or guardian. The [c]ourt also ordered that K.C. submit to paternity testing to determine if he was the biological father of the minor child. A three (3)[-]month [p]ermanency [r]eview hearing was to be scheduled.

On July 24, 2017, the initial [p]ermanency [r]eview [h]earing took place. At the time of the hearing, [M]other was not present, but was represented by counsel. The [c]ourt found that there had been moderate compliance by [M]other with the permanency plan.

The [c]ourt [o]rdered the following permanency plan for [M]other:

1. Complete the Erie Homes for Children and Adults parent skills education program and demonstrate the ability to provide for the health, safety, and welfare of the child;

2. Secure and/or maintain safe and stable housing;

3. Follow all psychological/psychiatric recommendations to include the counselling, medication management, and demonstrate mental health stability and the ability to maintain the child's safety through exercise of sound [judgment];

4. Inform the [A]gency of the identity of all household members, and;

- 4 -

5. Obtain a drug and alcohol assessment and follow through with all recommendations to include participation in the Esper Treatment Center's Random Urinalysis Program.

The [c]ourt ordered that the child's permanent placement goal was to return to parent or guardian. The [c]ourt also ordered that T.Y. be added as a party to the action and was ordered to submit to paternity testing to determine if he was the biological father of the minor child. K.C. was again also ordered to submit to paternity testing. A three[-]month [p]ermanency [r]eview hearing was to be scheduled.

On August 25, 2017[,] K.C. was excluded as biological father to the minor child through genetic testing.

On August 28, 2017, pursuant to a [m]otion to [c]hange [t]reatment [p]lan, the [c]ourt ordered that [M]other undergo a [p]sychological [e]valuation with Dr. Peter von Korff and follow all recommendations. All remaining provisions of the July 28, 2017 [p]ermanency [r]eview [o]rder remained effective.

On September 28, 2017[,] T.Y. was excluded as biological father to the minor child through genetic testing.

On October 25, 2017[,] the second [p]ermanency [r]eview [h]earing took place. At the time of the hearing, [M]other was present and represented by counsel. The [c]ourt found that there had been minimal compliance by [M]other with the permanency plan and minimal progress towards alleviating the circumstances which brought the child into placement.

The [c]ourt ordered the following permanency plan for [M]other:

1. Complete the Erie Homes for Children and Adults parent skills education program and demonstrate the ability to provide for the health, safety, and welfare of the child;

2. Secure and/or maintain safe and stable housing;

3. Follow all psychological/psychiatric recommendations to include counselling, medication management, and demonstrate mental health stability and the ability to maintain the child's safety through exercise of sound [judgment];

4. Inform the Agency of the identity of all household members;

5. Refrain from the use of drugs and/or alcohol [and] submit to random urinalysis testing through the color code program at the Esper Treatment Center;

6. Assist the Agency in obtaining her psychiatric evaluation from Safe Harbor Behavioral Health; and,

7. Participate in a cognitive assessment with an Agency[-]recommended provider.

The [c]ourt ordered the child's permanent placement goal was to return to parent or guardian. The [c]ourt also ordered that T.Y. and K.C. be removed as parties to the action as it had been determined that neither was the biological father of the minor child. It was ordered that W.K. be added as a party to the action, and he was directed to submit to paternity testing to determine if he was the biological father of K.B.T. A five (5)[-]month review hearing was to be scheduled.

The third [p]ermanency [h]earing took place on March 28, 2018. [Mother] was present and represented by counsel. Following testimony, the [c]ourt determined that there had been **no compliance** by [M]other with the permanency plan. Due to the lack of proper compliance by [M]other with the permanency plan, and the length of the child's placement, the [c]ourt changed the permanent placement plan to [a]doption. OCY was no longer to offer services, including visitation, to [M]other.

The Agency filed a [p]etition to [i]nvoluntarily [t]erminate the [p]arental [r]ights of [Mother] on April 12, 2018.[4] At that point, K.B.T. had been in placement for over 12 months, and [M]other had made minimal, at best, compliance with the treatment plan. [M]other had demonstrated an inability to remedy the conditions which brought the child into the care of the Agency. The grounds alleged by the Agency in its [p]etition were pursuant to 23 Pa.C.S.[] § 2511 (a)[(1)], (2), (5), (8), and 2511 (b).

. . .

Trial Court Opinion (K.B.T.), 9/26/18, at 1-5 (emphasis added).

---

[4] The Agency additionally sought to terminate the parental rights of the unknown biological father, which, as indicated, were terminated by separate decree dated July 16, 2018, and entered July 17, 2018.

On July 12, 2018, the trial court conducted a hearing on the termination petition. Mother was present and represented by counsel, Bryan L. Spry, Esquire.[5] In support thereof, the Agency presented the testimony of: Peter von Korff, Ph.D., a clinical psychologist who conducted a psychological evaluation of Mother at the request of the Agency;[6] Tina Ferraro, the director

_____

[5] K.B.T. was represented by legal counsel as well as a guardian *ad litem* during this proceeding. There is no evidence of an attempt to discern K.B.T.'s preference, as K.B.T. was under a year and a half old at the time of the hearing and too young to express a preference. As such, we find the requirements of 23 Pa.C.S. § 2313(a) satisfied. *See In re Adoption of L.B.M.*, 639 Pa. 428, 432, 441-42, 161 A.3d 172, 174-75, 180 (2017) (plurality) (stating that, pursuant to 23 Pa.C.S. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for the child's legal interests, defined as a child's preferred outcome); *see also In re T.S.*, ___ Pa. ___, 192 A.3d 1080, 1089-90, 1092-93 (2018) (finding the preferred outcome of a child who is too young or non-communicative unascertainable in holding a child's statutory right to counsel not waivable and reaffirming the ability of an attorney-guardian *ad litem* to serve a dual role and represent a child's non-conflicting best interests and legal interests); *cf. In re Adoption of T.M.L.M.*, 184 A.3d 585, 587-91 (Pa. Super. 2018) (vacating and remanding for further proceedings where the attorney admitted she did not interview the six-year-old child to ascertain the child's preferences); *In re Adoption of M.D.Q.*, 192 A.3d 1201 (Pa. Super. 2018) (vacating and remanding where the record does not indicate that counsel attempted to ascertain the children's preferences and the record does not reflect the children's legal interests); *In re Adoption of D.M.C.*, 192 A.3d 1207 (Pa. Super. 2018) (vacating and remanding where the record was unclear in what capacity the attorney had been appointed to represent the children and whether the attorney had ascertained the children's legal interests prior to the hearing).

[6] Counsel stipulated to Dr. Korff's expertise in the area of adult psychology. N.T., 7/12/18, at 4. Dr. Korff's report, dated November 6, 2017, was admitted without objection as Exhibit 9. *Id.* at 3, 5.

of Project First Step through Erie Homes for Children and Adults;[7] and

Shannon Spiegel, an Agency caseworker. Mother testified on her own behalf.

By decree entered July 16, 2018, the trial court involuntarily terminated

the parental rights of Mother to K.B.T. pursuant to 23 Pa.C.S. Section

2511(a)(1), (2), (5), (8), and (b). On August 13, 2018, Mother, through

Attorney Spry, filed a notice of appeal. Attorney Spry filed a Statement of

Intent to File **Anders** Brief in Lieu of Statement of Errors Complained of on

Appeal pursuant to Pa.R.A.P. 1925(c)(4) and **In re J.T.**, 983 A.2d 771 (Pa.

Super. 2009).[8]

The trial court summarized the procedural and factual history relevant

to B.K.T., Jr., in part, as follows:

**PROCEDURAL HISTORY AND FACTS**

---

[7] Ms. Ferraro, along with Lisa Kobusinski, a family specialist, issued reports dated October 5, 2017, and March 6, 2018. We observe that, while there is an indication on the record that these reports were made part of the record, **id.** at 20, and they are included as Exhibit 10 with the certified record, nowhere is this exhibit officially marked and admitted.

[8] We observe that Attorney Spry filed a motion to withdraw as counsel with this Court on September 19, 2018. The motion to withdraw was granted on September 26, 2018. Notably, current counsel on appeal, Wayne G. Johnson, Esquire ("Counsel"), filed an entry of appearance on September 19, 2018.

Subsequently, on December 3, 2018, this Court remanded this matter to determine if counsel had abandoned Mother and to protect Mother's appeal rights, as counsel failed to file a brief. By correspondence dated December 10, 2018, the trial court advised that it determined that Attorney Johnson did not abandon Mother.

B.K.T., Jr. was born [in January 2018], son of [Mother] and the father, K.C. The child was placed in protective custody on January 22, 2018. The placement was necessitated by [M]other's unstable mental health; unstable housing and homelessness; her inability to appropriately parent; [M]other's limitations that affected her ability to care for herself and a child. B.K.T., Jr., was subsequently adjudicated dependent for the same reasons that justified the protective placement in OCY custody.[9]

. . .

After B.K.T.'s adjudication as dependent, the treatment plan ordered for [M]other involved[] drug screens; mental health services; parenting skills training through Project First Step; following through with Dr. Peter von Korff's recommendations, as well as those made by mental health providers.

. . .

Trial Court Opinion (B.K.T., Jr.), 1/31/19, at 1-2 (citations to record omitted).

On July 30, 2018, the trial court held a permanency review hearing. Mother's compliance with the permanency plan was found to be minimal and her progress toward alleviating the circumstances that led to placement was found to be minimal. B.K.T.'s custody and placement were maintained. **See** Exhibit 4, 10/11/18, Order of Adjudication and Disposition, 3/1/18.

---

[9] B.K.T., Jr., was adjudicated dependent pursuant to order dated February 26, 2018, and entered March 1, 2018. **See** Exhibit 3, 10/11/18, certified dependency docket; **see also** Exhibit 4, 10/11/18, Order of Adjudication and Disposition, 3/1/18. B.K.T.'s placement was thereafter maintained. His permanent placement goal was to return to parent or guardian with a concurrent goal of adoption. **See** Exhibit 4, 10/11/18, Order of Adjudication and Disposition, 3/1/18.

On August 7, 2018, the Agency filed a petition to terminate Mother's parental rights.[10] On October 11, 2018, the trial court conducted a hearing on the termination petition. Mother was present and represented by counsel, Attorney Johnson.[11] In support thereof, the Agency again presented the testimony of: Peter von Korff, Ph.D., a clinical psychologist who conducted an psychological evaluation of Mother at the request of the Agency;[12] Tina Ferraro, the director of Project First Step through Erie Homes for Children and Adults;[13] Shannon Spiegel, an Agency caseworker; Michelle Dushole, an Agency caseworker and co-coordinator for the family dependency treatment court; and Michael Vicander, a permanency caseworker for the Agency. Mother, again, testified on her own behalf.

---

[10] The Agency additionally sought to terminate Father's parental rights, which were terminated voluntarily by decree dated October 10, 2018, and entered October 19, 2018. Father was present and questioned regarding his voluntary relinquishment on October 11, 2018. N.T., 10/11/18, at 4-7.

[11] B.K.T., Jr., was represented by legal counsel as well as a guardian *ad litem* during this proceeding. Similar to K.B.T., there is no evidence of an attempt to discern B.K.T., Jr.'s preference, as B.K.T., Jr., was approximately eight months old at the time of the hearing and too young to express a preference. As such, we, likewise, find the requirements of 23 Pa.C.S. § 2313(a) satisfied. **See footnote 5, supra.**

[12] Dr. von Korff's report, dated November 6, 2017, was admitted without objection as Exhibit 6. **Id.** at 21.

[13] Ms. Ferraro, along with Lisa Kobusinski, family specialist, issued reports dated October 5, 2017, and July 6, 2018. These reports were admitted without objection. **Id.** at 38. While specific reference to an exhibit number is not indicated on the record, the certified record reflects that these reports are Exhibit 7.

By decree dated October 18, 2018, and entered October 19, 2018, the trial court involuntarily terminated the parental rights of Mother to B.K.T., Jr., pursuant to 23 Pa.C.S. Section 2511(a)(1), (2), (5), and (b). On November 20, 2018, Mother, through Attorney Johnson, filed a notice of appeal. Counsel filed a Statement of Intent to File *Anders* Brief in Lieu of Statement of Errors Complained of on Appeal pursuant to Pa.R.A.P. 1925(c)(4) and *In re J.T.*, 983 A.2d 771 (Pa. Super. 2009). This Court consolidated Mother's appeals *sua sponte* on December 12, 2018.

When counsel files an *Anders* brief, this Court may not review the merits of the appeal without first addressing counsel's request to withdraw. *Commonwealth v. Washington*, 63 A.3d 797, 800 (Pa. Super. 2013); *see also Commonwealth v. Rojas*, 874 A.2d 638, 639 (Pa. Super. 2005) (stating, "When faced with a purported *Anders* brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw[]") (citation omitted). In *In re V.E. & J.E.*, 611 A.2d 1267 (Pa. Super. 1992), this Court extended the *Anders* principles to appeals involving the termination of parental rights. *Id.* at 1275. Counsel appointed to represent an indigent parent on appeal from a decree involuntarily terminating parental rights may therefore petition this Court for leave to withdraw representation and submit an *Anders* brief. *In re S.M.B.*, *A.M.B., & G.G.B.*, 856 A.2d 1235, 1237 (Pa. Super. 2004). In *Commonwealth v. Santiago*, 602 Pa. 159, 978 A.2d 349 (2009), our Supreme Court explained, "the major thrust of *Anders* . . . is to assure that counsel undertakes a careful

assessment of any available claim that an indigent appellant might have." ***Id.*** at 174, 358. It stated that this "is achieved by requiring counsel to conduct an exhaustive examination of the record and by also placing the responsibility on the reviewing court to make an independent determination of the merits of the appeal." ***Id.***

> First, to withdraw, counsel must:
>
> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [***Anders***] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

***Commonwealth v. Cartrette***, 83 A.3d 1030, 1032 (Pa.Super. 2013) (*en banc*) *citing* ***Commonwealth v. Lilley***, 978 A.2d 995, 997 (Pa.Super. 2009); ***see also Commonwealth v. Orellana***, 86 A.3d 877, 880 (Pa. Super. 2014); ***Commonwealth v. Millisock***, 873 A.2d 748, 751 (Pa.Super. 2005). Counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." ***Millisock***, 873 A.2d at 752.

Next, we review Counsel's ***Anders*** brief for compliance with the requirements set forth in ***Santiago***, ***supra***:

> counsel must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

602 Pa. at 178-79, 978 A.2d at 361. "Once counsel has satisfied the above requirements, it is then this Court's duty to conduct its own review of the trial court's proceedings and render an independent judgment as to whether the appeal is, in fact, wholly frivolous." *Commonwealth v. Goodwin*, 928 A.2d 287, 291 (Pa. Super. 2007) (*en banc*) *quoting* *Commonwealth v. Wright*, 846 A.2d 730, 736 (Pa. Super. 2004).

Counsel satisfied the first requirement of *Anders* by filing a petition to withdraw, wherein he asserts that he made a conscientious review of the record and determined the appeal would be frivolous. Likewise, Counsel satisfied the second requirement by filing an *Anders* brief that complies with the requirements set forth in *Santiago*, *supra*. With respect to the third requirement, Counsel attached to the petition to withdraw a copy of the letter sent to Mother advising her of her rights, and enclosing a copy of the *Anders* brief. Hence, we conclude that Counsel complied with the procedural *Anders* requirements and we proceed to a review of the merits.

Counsel's *Anders* brief raises the following issues for our review:

1. Did the [trial court] commit an abuse of discretion or error of law when it concluded that the Agency established sufficient grounds for termination under 23 Pa.C.S.[] § 2511(a)(1)?

2. Did the [trial court] commit an abuse of discretion or error of law when it concluded that the Agency established sufficient grounds for termination under 23 Pa.C.S.[] § 2511(a)(2)?

3. Did the [trial court] commit an abuse of discretion or error of law when it concluded that the Agency established sufficient grounds for termination under 23 Pa.C.S.[] § 2511(a)(5)?

4. Did the [trial court] commit an abuse of discretion or error of law when it concluded that the Agency established sufficient grounds for termination under 23 Pa.C.S.[] § 2511(a)(8)?

5. Did the [trial court] commit an abuse of discretion or error of law when it concluded that termination of [Mother's] parental rights was in the [Children's] best interest under 23 Pa.C.S.[] § 2511(b)?

*Anders* Brief at 7 (answers and suggested answers omitted) (unnecessary capitalization omitted).

In matters involving involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

*In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even

- 14 -

if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) *quoting Matter of Adoption of Charles E.D.M., II*, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998).

In the case *sub judice*, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b) with respect to K.B.T., and 23 Pa.C.S. § 2511(a)(1), (2), (5), and (b) with respect to B.K.T., Jr. We have long held that, in order to affirm a termination of parental rights,

we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's termination decrees pursuant to subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), and (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1)

repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) *quoting* *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re A.L.D.*, 797 A.2d at 340 (internal quotation marks and citations omitted).

In the case at bar, in finding grounds for termination pursuant to Section 2511(a)(2), as well as subsections (a)(1), (a)(5), and (a)(8), as to K.B.T., the trial court reasoned,

> A review of the evidence details a mother either incapable [of] or refusing [to], or both, take an active role in seeking the return of her son. All the programs designed specifically to address [Mother]'s personal and parenting deficiencies were rejected by her. Tina Ferraro from Project First Step noted all the efforts made to work individually with [Mother]. From personalizing the parenting programs, to encouraging [Mother] to engage in mental health treatment, all of Project First Step's efforts were met with indifference by [Mother]. Failing to consistently visit; expressing a cavalier attitude towards parenting education; becoming

- 17 -

agitated and resentful at suggestions designed to improve parenting skills; refusing to even acknowledge the need for mental health therapy, were all factors in determining [Mother's] refusal to remedy the conditions which led to the placement of K.B.T.

Dr. von Korff's opinion that only intensive work on a multi-faceted level could address [Mother]'s mental health issues necessitated a committed effort by [Mother] to get herself into a position to parent her son. The evidence reveals that that effort and commitment was not attempted by [Mother]. Without such mental health involvement, K.B.T. could not be in a stable and safe environment with [Mother]. [Mother] refused to avail herself [of] the services necessary to remove the reasons for the placement of K.B.T. The child has been in placement since March, 2017. [Mother] has had more than a reasonable period of time to exhibit an effort to attempt, through all the services provided to her, to remedy the conditions which led to the child's removal.

[Mother] gave her reasons for refusing the services offered to her. Her testimony is replete with references that she quit or refused services because she wasn't getting anything out of them. The list of services included parenting, mental health therapy, and her medications.

. . .

This [c]ourt heard the testimony, reviewed the evidence, and observed the witnesses. The [c]ourt attaches no credibility to [Mother's] excuses for refusing to accept her role as a parent. She rejected all services designed for her to get her son returned to her care. This [c]ourt did not abuse its discretion in finding that the Agency presented clear and convincing evidence that the parental rights of [Mother] to her son K.B.T. should be terminated pursuant to 23 Pa.C.S.[] §2511 (a)(2), (5), and (8). . . .[14]

Trial Court Opinion (K.B.T.), 9/26/18, at 10-11.

The trial court found similarly as to B.K.T., Jr., in finding grounds for

termination pursuant to subsection (a)(2), as well as subsections (a)(1) and

_____

[14] As reflected by the decree, the court additionally terminated Mother's parental rights pursuant to Section 2511(a)(1). *See* Decree (K.B.T.), 7/17/18.

- 18 -

(a)(5), noting Mother's ongoing failure to comply with services related to parenting and mental health.  Trial Court Opinion (B.K.T., Jr.), 1/31/19, at 8-10.  The trial court further stated,

> . . .The child has been in placement since January 22, 2018. Mother's history with OCY demonstrates that she cannot and will not within a reasonable period of time, exhibit an effort to attempt, through all the services provided to her, to remedy the conditions which led to the child's removal.
>
> . . .
>
> This [c]ourt heard the testimony, reviewed the evidence, and observed the witnesses.  The [c]ourt attaches no credibility to [Mother's] excuses for refusing to accept her role as a parent.  She rejected all services designed for her to get her son returned to her care.  This [c]ourt did not abuse its discretion in finding that the Agency presented clear and convincing evidence that the parental rights of [Mother] to her son B.K.T., Jr., should be terminated pursuant to 23 [Pa.C.S.] §2511 (a)(1), (2), and (5). . . .

*Id.* at 9-10.

A review of the record supports the trial court's finding of grounds for termination under Section 2511(a)(2).  The record reveals that Mother failed to alleviate any concerns with regard to her ability and capacity to care for the Children.  As we discern no abuse of discretion or error of law, we do not disturb the court's findings.

At the hearing regarding K.B.T. on July 12, 2018, Agency caseworker, Shannon Spiegel, reported that K.B.T. came into care "due to mental health concerns, unstable housing, concerns about who [Mother] associates with and allows into her home, [and] lack of parenting skills."  N.T., 7/12/18, at 41.

Ms. Spiegel noted permanency review hearings in July 2017, October 2017, and March 2018, and acknowledged that, throughout, Mother "never demonstrated an ability wherein she alleviated the circumstances regarding [K.B.T.]'s placement." *Id.* at 44. She further stated that Mother never substantially complied with the terms of the court-ordered treatment plan. *Id.* Significantly, Ms. Spiegel testified that Mother never demonstrated stable mental health, indicating, ". . . If anything, she's exhibiting more unstable behavior [] recent[ly]." *Id.* at 47. While acknowledging that Mother's housing circumstances improved,[15] Ms. Spiegel confirmed that Mother continued to demonstrate unstable mental health. She further expressed that Mother never demonstrated an ability to safely parent the child and never alleviated the circumstances that resulted in placement. *Id.* at 48. She observed that Mother had "difficulty reading [K.B.T.]'s cues" and "wasn't responsive to redirection." *Id.* at 45. Ms. Spiegel stated, ". . . If the child -- if [K.B.T.] was in Mother's care, I would have concerns for his well-being and for his life ultimately. She has not alleviated the circumstances that led to removal. She has not made any significant progress with [K.B.T.] in the course of a year." *Id.* at 49. Ms. Spiegel further indicated that K.B.T. is not safe in Mother's care and would be in physical danger. *Id.* at 58.

_____

[15] Ms. Spiegel noted that roommates are no longer in Mother's home. *Id.* at 48.

Likewise, Tina Ferraro, the director of Project First Step through Erie Homes for Children and Adults, indicated that Project First Step worked with Mother with regard to K.B.T. from March 2017 to March 2018.[16] *Id.* at 18, 30-31. Ms. Ferraro noted that, during this time, Mother did not consistently engage in services, and, in fact, "got worse as the year progressed." *Id.* at 31. Ms. Ferraro testified that Mother did not exhibit the ability to safely parent K.B.T. *Id.* Aside from housing concerns, all of the circumstances with which Mother presented remained.[17] *Id.* Hence, Ms. Farraro stated, Mother "has yet to demonstrate the ability to independently care [for] her son K.B.T. or provide a safe and stable environment for [him]." *Id.*

At the hearing on October 11, 2018 regarding B.K.T., Jr., Ms. Spiegel similarly recounted that the reasons B.K.T., Jr., was placed were "because of

---

[16] Ms. Ferraro explained that Project First Step "is a multiservice program. We work with families who have a variety of concerns, mental illness, drug and alcohol concerns, intellectual disabilities, and physical disabilities. Those are the most common referrals that we get for parents." *Id.* at 19. She noted that Mother self-referred late in her pregnancy with K.B.T. into the pre-natal service. *Id.*

[17] Specifically, Ms. Ferraro acknowledged encouraging Mother to follow through with her mental health treatment. While unable to verify that Mother was participating in medication management, Ms. Ferarro stated that "[Mother's] behavior is concerning if she is, in fact, taking medication or actively involved in treatment. It hasn't improved, and it actually has gotten worse." *Id.* at 41. Due to issues with her blended case manager, Ms. Ferraro noted a lack of "confidence that [Mother] was really engaged in her mental health treatment." *Id.* Mother reported that she had been stabilized and taking medication since K.B.T.'s birth. *Id.* at 61. She further reported to participating in therapy. *Id.* at 61-62.

concerns of unstable mental health, history of unstable housing and homelessness, [M]other's inability to demonstrate appropriate parenting skills, as well as mom's limitations and how they affect her ability to care for the child and herself." N.T., 10/11/18, at 49. Ms. Spiegel testified that the following services were offered to Mother, "color code[18]…mental health services, participation with parenting through Project First Step, follow through with recommendations from Dr. von Korff's report, meeting with Dr. von Korff…and following through with recommendations made by mental health providers." *Id.* at 50.

Further, Ms. Spiegel testified that, subsequent to adjudication, at the time of B.K.T., Jr.'s, dispositional hearing in February of 2018, the Agency recommended adoption as a concurrent goal "because [of] that history of noncompliance with court-ordered services, [and] the lack of follow-through with the programs she's already had in place." *Id.* at 51. A permanency review hearing was held thereafter in July 2018. Mother was "minimally

---

[18] Michelle Dushole, Agency caseworker and co-coordinator for the family dependency treatment court, explained that "[w]hen a caseworker/supervisor feels that one of their client has an issue with either/or drugs and/or alcohol, they will send a referral to our unit. We'll process it. We'll send out a letter to put them, the client, on random urinalyses where they will attend on specific dates and specific times at the Esper Treatment Center." *Id.* at 43-44. She further indicated that clients are assigned a color with regard to when to submit for testing. *Id.* at 45. From February 21, 2018 through July 30, 2018, Mother submitted to fourteen negative urine screens, eight no-show screens, and one could not produce. *Id.* at 45, 47; *see also* Exhibit 8, 10/11/18.

compliant" with mental health services, "fired" her blended case manager,[19] not compliant with Project First Step, and had "minimal" visitation. *Id.* at 51-52. As to Project First Step, Ms. Spiegel explained that Mother had "[a] lot of difficulties with accepting redirection during the sessions and attendance as well." *Id.* at 52. Critically, Tina Ferraro, director of Project First Step stated that, as of July 6, 2018, Mother still had not made progress to where she could safely parent either child. *Id.* at 37. Ms. Ferraro noted that many of the concerns with regard to Mother, including mental health and lack of parenting, remained, and, in fact, had worsened." *Id.* at 35. She opined that Mother "struggled to take care of herself, chose not to actively engage in parenting instructions," and had issues with visitation.[20] *Id.* at 37-38.

Moreover, Dr. von Korff testified that Mother exhibited "a striking lack coherence and insight and an ability to speak in an integrated way about her circumstance."[21] *Id.* at 12. He opined that "Mother would need significant mental health counseling, care treatment to care for herself, but also intensive

---

[19] Mother acknowledged terminating the services of the blended case manager, Rebecca, stating that "she didn't like [Rebecca's] attitude toward things. We would fight on basic, little things. . . . " N.T., 7/12/18, at 63. She testified to an intake appointment for a new blended case manager at the July 2018 hearing. N.T., 10/11/18, at 64.

[20] Ms. Ferraro recounted Mother's last visit with B.K.T., Jr., where Mother threatened to leave with B.K.T., Jr., but relented after the police were called. *Id.* at 36-37; *see also* N.T., 7/12/18, at 47-48.

[21] While Dr. von Korff indicated that Mother reported diagnoses of bipolar disorder and post-traumatic stress disorder, he offered that she may have schizoaffective disorder. *Id.* at 20, 23-25.

parenting skills to allow her to safely parent a minor child." N.T., 7/12/18, at 10. He expressed that it remained his recommendation that "[a]ny thoughts of placing [the Children] in [] [M]other's care would require [Mother]'s mental health issues [to] have been adequately addressed and [that] she has shown the ability to benefit from and sustain her involvement with such services." *Id.* at 20-21.

As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). Hence, the record substantiates the conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused Children to be without essential parental control or subsistence necessary for their physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Mother cannot or will not remedy this situation. *See id.* As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b), and we, therefore, need not address any further subsections of Section 2511(a). *In re B.L.W.*, 843 A.2d at 384.

We next determine whether termination was proper under Section 2511(b). Our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b).  The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012).  In *In re E.M.*, [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child.  The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.  *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 620 Pa. at 628-29, 71 A.3d at 267.  "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony.  Social workers and caseworkers can offer evaluations as well.  Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted).

Moreover,

> [w]hile a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

In the case *sub judice*, in determining that the Children's needs and welfare favor the termination of Mother's parental rights, the trial court stated,

> . . . [T]he testimony provided by Shannon Speigel established that there was no parental bond between [M]other and son.  A review of additional evidence has shown the child is in a good, stable home and has bonded well with the potential adoptive parents. The termination of [Mother's] parental rights is in the best interests of K.B.T.  23 Pa. C.S.[] §2511 (b).

Trial Court Opinion (K.B.T.), 9/26/18, at 11.[22]

Upon review, we discern no abuse of discretion.  The record supports the trial court's finding that the Children's developmental, physical and emotional needs and welfare favor termination of Mother's parental rights pursuant to Section 2511(b).  There was sufficient evidence to allow the trial court to make a determination that, due to the lack of a bond between Mother and the Children, termination would not have a detrimental impact on the Children.

Both children were removed from Mother's custody and placed in foster care at birth.  N.T., 10/11/18, at 49-50, 55-56; N.T., 7/12/18, at 46.  Mother's visitation was noted as inconsistent and Agency caseworker, Shannon Spiegel, observed that during visitation the Children were either "stressed" or

---

[22] The trial court reasoned similarly as to B.K.T., Jr.  Trial Court Opinion (B.K.T., Jr.), 1/31/19, at 10.

"agitated." N.T., 10/11/18, at 52, 53-54, 59; N.T., 7/12/18, at 45, 52. She confirmed that there did not appear to be a "healthy bond" between Mother and the Children. N.T., 10/11/18, at 53-54, 59; N.T., 7/12/18, at 45. Specifically, as to K.B.T., Ms. Spiegel stated, "I would say that [Mother] loves her child, of course she does. She exhibits -- she states that she does. She talks to him lovingly. There's just not a strong connection between the mother and child." N.T., 7/12/18, at 53. As to B.K.T., Jr., Ms. Spiegel stated, "Often times there was such a period of time between visits that the next visit the child would feel strange around [Mother] because he would see his mom inconsistently. It was almost like the first visit every time she had one because of the period of time between each visit." N.T., 10/11/18, at 53-54. Further, as indicated, Ms. Spiegel expressed concern that K.B.T. is not safe in Mother's care and would be in physical danger. N.T., 7/12/18, at 58.

Moreover, the Children are doing well and their needs being met in their foster home where they are placed together. N.T., 10/11/18, at 55-56; N.T., 7/12/18, at 49. Both are described as bonded with their foster family and each other. *Id.* at 56, 58, 61; 49. Michael Vicander, an Agency permanency caseworker, who had the opportunity to observe B.K.T., Jr., in the foster home, testified, "[h]e has a very natural relationship with the [foster family]. If he did not know he was a foster child, that relationship would be indistinguishable from a biological child." N.T., 10/11/18, at 61. As a result, Ms. Spiegel opined that there would not be a detrimental impact if Mother's parental rights were terminated. *Id.* Moreover, as to K.B.T., Ms. Spiegel

explained, "I have significant concerns. If the child -- if [K.B.T.] was in Mother's care, I would have concerns for his well-being and for his life ultimately. She has not alleviated the circumstances that led to removal. She has not made any significant progress with [K.B.T.] in the course of a year." N.T., 7/12/18, at 49. When asked at the hearing why B.K.T., Jr., should be permanently removed from Mother's care Ms. Spiegel testified,

> I feel that way because looking at [Mother's] extensive history with the Agency, the concerns with mental health and instability, the housing instability, her inability to meet her own needs, let alone a child's, I'm not confident that she can care for the basic needs of [B.K.T., Jr.].
>
> He deserves permanency. He's remained in the [] foster home with his brother and developed a bond with the foster parents and his needs are met fully.

N.T., 10/11/18, at 56. Likewise, both she and Agency permanency caseworker, Michael Vicander, offered that it would be in the children's best interest to proceed with adoption. *Id.* at 50, 61.

Thus, as confirmed by the record, termination of Mother's parental rights serves the Children's developmental, physical, and emotional needs and welfare and was proper pursuant to Section 2511(b). While Mother may profess to love the Children, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. At the time of the hearing, the Children had already been in care their entire young lives, approximately sixteen months and nine months, respectively, and are entitled permanency and stability. As we

stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." ***Id.*** at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his [or her] child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." ***In re B., N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004) (citation omitted).

Based on the foregoing independent analysis of the trial court's termination of Mother's parental rights, we agree with counsel for Mother that the within appeal is wholly frivolous.[23] As such, we affirm the decrees of the trial court, and grant Counsel's petition to withdraw.

Decrees affirmed. Petitions to withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/27/2019

---

[23] Further, we note that our independent review of the record did not reveal any additional, non-frivolous issues overlooked by counsel. ***See Commonwealth v. Flowers***, 113 A.3d 1246, 1250 (Pa.Super. 2015) (citing ***Commonwealth v. Goodwin***, 928 A.2d 287 (Pa.Super. 2007) (*en banc*)).